BAKER MARQUART LLP
Ryan Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Donald Pepperman (Bar No. 109809)
  dpepperman@bakermarquart.com
Scott Malzahn (Bar No. 229204)
  smalzahn@bakermarquart.com
Teresa L. Huggins (Bar No. 263257)
  thuggins@bakermarquart.com
777 S. Figueroa St., Suite 2850
Los Angeles, California 90017
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Defendant and*
*Counterclaimant Carsten Breitfeld*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| BYTON NORTH AMERICA CORPORATION, a Delaware corporation; and BYTON LIMITED, a Hong Kong company,<br><br>                  Plaintiffs,<br><br>        v.<br><br>ICONIQ MOTORS NORTH AMERICA, INC., a California corporation; CARSTEN BREITFELD, an individual; and DOES 1 through 10, inclusive,<br><br>                  Defendants.<br>_____<br>CARSTEN BREITFELD, an individual,<br><br>                  Counterclaimant, | Case No. 2-19-cv-10563<br><br>**DEFENDANT AND COUNTERCLAIMANT CARSTEN BREITFELD'S ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT; CARSTEN BREITFELD'S COUNTERCLAIMS AGAINST BYTON NORTH AMERICA CORPORATION, BYTON LIMITED AND ROES 1-10**<br><br>**[DEMAND FOR JURY TRIAL]**<br><br>Judge:  Dolly Gee<br>Courtroom:  8C |

v.

BYTON NORTH AMERICA
CORPORATION, a Delaware
corporation; BYTON LIMITED, a
Hong Kong company;
and ROES 1 through 10, inclusive,

Counterdefendants.

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant and Counterclaimant Carsten Breitfeld ("Breitfeld" or "Defendant"), by and through his undersigned counsel, answers Plaintiffs Byton Limited ("Byton") and Byton North America Corporation's ("Byton NA's" and, with Byton, together, "Plaintiffs'") Complaint in the above-captioned matter as follows:

## NATURE OF THE ACTION

1.      Admit that Byton is a designer and manufacturer of "smart" electric vehicles.  Admit that Breitfeld served as Byton's Chief Executive Officer, Chief Technology Officer, and Chairman of the Board from July 1, 2016, until April 2019, and as a director of Byton NA.  Admit that Breitfeld worked for Iconiq Motors North America, Inc. ("Iconiq") beginning in April 2019.  Paragraph 1 contains legal arguments, opinions and conclusions that require no response.  Breitfeld denies the remaining allegations of this paragraph.

## PARTIES

2.      Admit that Byton is a Hong Kong company with its registered office in Hong Kong and global headquarters in Nanjing, China.  Admit that Byton designs, develops, and manufactures electric vehicles.  Breitfeld is without sufficient knowledge or information to form a belief as to the remaining allegations of paragraph 2, and, on that basis, denies the remaining allegations of paragraph 2.

3.      Admit that Byton NA is a Delaware corporation with its principal place of business in Santa Clara, California.  Admit that Byton NA is a subsidiary of Byton and serves as Byton's North American headquarters.  Breitfeld is without sufficient knowledge or information to form a belief as to the remaining allegations of paragraph 3, and, on that basis, denies the remaining allegations of paragraph 3.

4.      Admit that Iconiq is a dissolved California corporation that had its principal place of business in Los Angeles County, California.  Paragraph 4 contains legal arguments, opinions and conclusions that require no response.  Breitfeld  is without sufficient knowledge or information to form a belief as to the remaining

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1   allegations of paragraph 4, and, on that basis, denies the remaining allegations of
2   paragraph 4.

3       5.     Admit.

4       6.     Paragraph 6 contains legal arguments, opinions and conclusions that
5   require no response.  Breitfeld otherwise denies the allegations of this paragraph.

6                             **JURISDICTION AND VENUE**

7       7.     Admit.

8       8.     Admit that venue is proper in the Central District of California under 28
9   U.S.C. § 1391(b), and that Breitfeld is subject to personal jurisdiction in this district.
10   Breitfeld otherwise denies the allegations of this paragraph.

11                             **FACTUAL ALLEGATIONS**

12       9.     Paragraph 9 contains legal arguments, opinions and conclusions that
13   require no response.  Breitfeld otherwise denies the allegations of this paragraph.

14       10.    Paragraph 10 contains legal arguments, opinions and conclusions that
15   require no response.  Breitfeld otherwise denies the allegations of this paragraph.

16       11.    Paragraph 11 contains legal arguments, opinions and conclusions that
17   require no response.  Breitfeld otherwise denies the allegations of this paragraph.

18       12.    Admit that Breitfeld co-founded Byton in 2016, and served, at times, as
19   its Chief Executive Officer, Chief Technology Officer, and Chairman of the Board of
20   Directors.  Admit that Breitfeld also, at times, served as Byton's NA's Chief
21   Executive Officer, Chief Financial Officer, and as a director on Byton NA's Board.
22   Paragraph 12 contains legal arguments, opinions and conclusions that require no
23   response.  Breitfeld otherwise denies the allegations of this paragraph.

24       13.    Admit that Breitfeld announced at an automobile show in Shanghai on or
25   about April 16, 2019, that he had become the Chief Executive Officer of Iconiq.
26   Paragraph 13 contains legal arguments, opinions and conclusions that require no
27   response.  Breitfeld otherwise denies the allegations of this paragraph.

28

14.     Paragraph 14 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

15.     Admit that, on January 23, 2019, the Byton's board removed Defendant as CEO of Byton, Byton NA and other Byton entities, as well as Adjunct Chief Architect of Byton, and fundamentally varied Defendant's job duties in violation of Defendant's Employment Contract with Byton.  Paragraph 15 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

16.     Breitfeld is without sufficient knowledge or information to attest to what "other high-level Byton employees who left Byton" have done.  Paragraph 16 contains legal arguments, opinions and conclusions that require no response. Breitfeld otherwise denies the allegations of this paragraph.

17.     Deny.

18.     Breitfeld is without sufficient knowledge or information to form a belief as to the allegations of paragraph 18, and, on that basis, denies the allegations of paragraph 18.

19.     Paragraph 19 contains legal arguments, opinions and conclusions that require no response.  Breitfeld is without sufficient knowledge or information to form a belief as to the remaining allegations of paragraph 19, and, on that basis, denies the allegations of paragraph 19.

## FIRST CAUSE OF ACTION

### Misappropriation of Trade Secrets

### Under the California Uniform Trade Secrets Act, Civil Code §§ 3426, et seq.

### (By All Plaintiffs Against All Defendants)

20.     Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

21.     Paragraph 21 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

22.     Paragraph 22 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

23.     Paragraph 23 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

24.     Paragraph 24 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

25.     Deny.

26.     Deny.

27.     Deny.

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets

### Under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.

### (By All Plaintiffs Against All Defendants)

28.     Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

29.     Paragraph 29 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

30.     Paragraph 30 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

31.     Paragraph 31 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

32.     Paragraph 32 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

33.     Deny.

34.     Deny.

1    35.    Deny.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duties

### (By Byton NA Against Dr. Breitfeld)

36.    Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

37.    Admit that Breitfeld was, at times, a director and executive officer, including CEO, of Byton NA.  Paragraph 37 otherwise contains legal arguments, opinions and conclusions that require no response.

38.    Deny.

39.    Deny.

40.    Deny.

## FOURTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (By All Plaintiffs Against All Defendants)

41.    Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

42.    Paragraph 42 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

43.    Paragraph 43 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

44.    Breitfeld is without sufficient information or knowledge to attest to what Iconiq was aware of.  Paragraph 44 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

45.    Paragraph 45 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

46.     Breitfeld is without sufficient information or knowledge to attest to what duties Iconiq may have owed or breached or who it may have solicited.  Paragraph 46 contains legal arguments, opinions and conclusions that require no response. Breitfeld otherwise denies the allegations of this paragraph.

47.     Paragraph 47 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

48.     Deny.

49.     Deny.

## FIFTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (By All Plaintiffs Against All Defendants)

50.     Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

51.     Paragraph 51 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

52.     Paragraph 52 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

53.     Paragraph 53 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

54.     Paragraph 54 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

55.     Breitfeld is without sufficient information or knowledge to attest to what duties Iconiq may have owed or breached or who it may have solicited.  Paragraph 55 contains legal arguments, opinions and conclusions that require no response. Breitfeld otherwise denies the allegations of this paragraph.

56.     Paragraph 56 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

57.   Deny.

## SIXTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (By All Plaintiffs Against All Defendants)

58.   Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

59.   Paragraph 59 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

60.   Paragraph 60 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

61.   Deny.

62.   Breitfeld is without sufficient knowledge or information to attest to what "former employees" have done, and, on that basis, denies the allegations of Paragraph 62.

63.   Paragraph 63 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

64.   Paragraph 64 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

65.   Deny.

66.   Paragraph 66 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

67.   Deny.

68.   Deny.

//

//

//

//

7

## SEVENTH CAUSE OF ACTION

### Conversion

### (By All Plaintiffs Against All Defendants)

69.   Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

70.   Paragraph 70 contains legal arguments, opinions and conclusions that require no response.  Breitfeld otherwise denies the allegations of this paragraph.

71.   Deny.

72.   Deny.

## EIGHTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law

### Under Business and Professions Code §§ 17200 et seq.

### (By All Plaintiffs Against All Defendants)

73.   Breitfeld incorporates by reference as though fully set forth herein his responses to the preceding paragraphs of Plaintiffs' Complaint.

74.   Deny.

75.   Deny.

## AFFIRMATIVE DEFENSES

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Defendant further pleads the following separate and additional defenses.  By pleading these defenses, Defendant does not in any way agree or concede that he has the burden of proof or persuasion on any of these issues.  Defendant reserves the right to assert such additional affirmative defenses as discovery indicates are proper.

## FIRST AFFIRMATIVE DEFENSE

### (Contrary to the Parties' Written Agreement)

The relief sought by the Plaintiffs is contrary to the terms of the written employment contract between Byton and Defendant, which specifies that Byton shall

1 | pay Defendant the full financial entitlements due under the contract if the contract is
2 | terminated or ends for no matter what reason, other than by Defendant's own
3 | initiative.

### SECOND AFFIRMATIVE DEFENSE

### (Offset)

While Defendant denies that Plaintiffs are entitled to any recovery at all, Plaintiffs allege that any such recovery must be offset against amounts Plaintiffs owe or are found to owe to Defendant by virtue of Plaintiffs' conduct and breaches of their contractual obligations to Defendant.

### THIRD AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted.

### FOURTH AFFIRMATIVE DEFENSE

### (Independent Development)

Defendant alleges that any information alleged to be trade secrets were acquired, if at all, properly, and therefore there has been no misappropriation.

### FIFTH AFFIRMATIVE DEFENSE

### (Public Information)

Plaintiffs' claims are barred in whole or in part because Defendant cannot be liable for misappropriation of information that was public and/or otherwise fails to meet the requirements for trade secret protection.

### SIXTH AFFIRMATIVE DEFENSE

### (Failure to Keep Information Secret)

Plaintiffs failed to take reasonable efforts to maintain the secrecy and confidentiality of their alleged trade secrets.

//

//

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1

## SEVENTH AFFIRMATIVE DEFENSE

2

### (No Access to Trade Secrets)

3

Defendant never had access to Plaintiffs' alleged trade secrets.

4

## EIGHTH AFFIRMATIVE DEFENSE

5

### (Failure to Allege Trade Secrets with Particularity)

6

Plaintiffs have failed to identify with particularity information they alleged to

7

be trade secrets, Cal. Code Civ. Proc. § 2019.210.

8

## NINTH AFFIRMATIVE DEFENSE

9

### (Preemption by California Uniformed Trade Secrets Act)

10

Plaintiffs' claims are preempted in whole or part by the California Uniform

11

Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq*.

12

## TENTH AFFIRMATIVE DEFENSE

13

### (No Wrongful Act)

14

Defendant took no actions that interfered with any business relationships or

15

contracts of Plaintiffs nor committed any other wrongful act or omission that caused,

16

or in any way contributed, to the injury and losses alleged by Plaintiffs.

17

## ELEVENTH AFFIRMATIVE DEFENSE

18

### (No Conversion)

19

Defendant has not exercised dominion over any property of Plaintiffs to

20

Plaintiffs' exclusion.

21

## TWELFTH AFFIRMATIVE DEFENSE

22

### (Proximate Cause)

23

All or some of Plaintiffs' purported claims are barred, in whole or in part,

24

because Defendant did not proximately cause any of the violations, losses, damages,

25

injuries or harms alleged in the Complaint.

26

//

27

//

28

10

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1

## THIRTEENTH AFFIRMATIVE DEFENSE

2

### (Actions of Third Parties)

3    The conduct Plaintiffs complain of resulted, if at all, from the actions of third

4 parties for which Defendant is not responsible.  If Plaintiffs sustained any loss, injury,

5 or damages, equitable or legal, based on the allegations in the Complaint, such

6 damages, loss or injury was caused by others, and not by Defendant.

7

## FOURTEENTH AFFIRMATIVE DEFENSE

8

### (Unclean Hands)

9    The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

10

## FIFTEENTH AFFIRMATIVE DEFENSE

11

### (Estoppel)

12    The Complaint is barred, in whole or in part, based on the principles of

13 estoppel.

14

## SIXTEENTH AFFIRMATIVE DEFENSE

15

### (Equitable Estoppel)

16    All or some of Plaintiffs' purported claims are barred by the doctrine of

17 equitable estoppel by reason of Plaintiffs' acts, omissions, representations and courses

18 of conduct, on which Plaintiffs caused Defendant to rely to Defendant's detriment.

19

## SEVENTEENTH AFFIRMATIVE DEFENSE

20

### (Laches)

21    The Complaint is barred, in whole or in part, by the doctrine of laches.

22

## EIGHTEENTH AFFIRMATIVE DEFENSE

23

### (Waiver)

24    The Complaint is barred, in whole or in part, by the doctrine of waiver.

25

## NINETEENTH AFFIRMATIVE DEFENSE

26

### (Comparative Fault)

27    The Complaint is barred, in whole or in part, based on the doctrine of

28

comparative fault.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

The Complaint is barred, in whole or in part, based on Plaintiffs' failure to mitigate damages.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Justification)

All or some of Plaintiffs' claims are barred in whole or in part because Defendant's actions with respect to the subject matter alleged in the claims, and each of them, were undertaken in good faith with the absence of malicious intent to injure Plaintiffs and constitute lawful, proper, and justified means to further the purpose of engaging and continuing in business.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Competitor Privilege)

Plaintiffs' claims are barred in whole or in part by the competitor privilege.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (No Punitive Damages)

No action by Defendant occurred with malice, oppression, or fraud, and so no recovery of punitive damages is possible.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

All or some of Plaintiffs' purported claims are barred, in whole or in part, because the damages alleged by Plaintiffs are wholly speculative.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (No Damage)

There has been no damage in any amount, manner or at all by reason of any act alleged against Defendant in the Complaint, and the relief prayed for in the Complaint

therefore cannot be granted.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Illegal Contracts)

Plaintiffs' claims are based, in whole are in part, on contracts that are illegal and unenforceable under California Business & Professions Code § 16600.

## ADDITIONAL AFFIRMATIVE DEFENSE

### (Subsequently Discovered Defense)

Defendant has insufficient knowledge or information upon which to form a belief as to whether he may have additional affirmative defenses, and reserves the right to assert additional defenses if and as he learns of facts that may support such defenses.

## PRAYER

WHEREFORE, Defendant prays for relief as follows:

1.     That the Complaint be dismissed, with prejudice and in its entirety.

2.     That Plaintiffs take nothing by this action and that judgment be against Plaintiffs and in favor of Defendant;

3.     That Defendant be awarded his attorneys' fees and costs incurred in defending this action;

4.     That Defendant be granted such other and further relief as the Court may deem just and proper.

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1

## **COUNTERCLAIMS**

2      Pursuant to Federal Rule of Civil Procedure 13, Defendant and Counterclaimant

3 Carsten Breitfeld ("Breitfeld" or "Counterclaimant"), by and through his undersigned

4 counsel, asserts counterclaims against Byton Limited ("Byton") and Byton North

5 America ("Byton NA" and with Byton, together, "Plaintiffs" or "Counterdefendants")

6 and alleges as follows:

7

## **INTRODUCTION AND SUMMARY OF COUNTERCLAIMS**

8      1.     After leading the design of BMW's groundbreaking electric car, the i8,

9 Breitfeld left BMW in 2016 to co-found Byton and lead the development of that

10 company's new electric concept car.  Breitfeld co-founded Byton with Daniel Kirchert

11 ("Kirchert"), a colleague at BMW.  Breitfeld had worked at BMW for 20 years and

12 wanted a written contract before agreeing to work on the new start-up.  In December

13 2015, Breitfeld signed an Employment Contract with Byton (the "Employment

14 Contract"), in which the parties agreed that Breitfeld would become CEO, director and

15 Chairman of Byton and its subsidiaries, as well as Adjunct Chief Architect of Byton.

16 In exchange, Breitfeld was promised certain compensation, including a salary, pension,

17 deferred compensation, annual leave, stock options, bonuses, insurance, and other

18 benefits.  Breitfeld's employment was for an agreed-upon fixed term of five years.

19 Byton agreed that it would "pay the full financial entitlements under the Contract," if

20 the contract was "terminated or ends no matter what reason," other than Breitfeld's

21 "own initiative."

22      2.     In 2016, Breitfeld began work at Byton.  As CEO, Breitfeld led Byton's

23 Executive Committee, management team and daily operations, including product

24 development and business strategy, as the parties had agreed.  In 2017, the parties

25 agreed that Breitfeld would be seconded to Byton's subsidiary, Byton NA, to oversee

26 Byton's operations in North America.  Breitfeld worked out of the subsidiary's Santa

27 Clara, California office.   As CEO of Byton NA, Breitfeld had oversight and

28

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

responsibility for the subsidiary's daily operations, including research and development, business development, and marketing. While seconded to Byton NA, Breitfeld at all times remained CEO, Chairman and director of Byton and its other subsidiaries and Adjunct Chief Architect of Byton. He performed all required job duties and contractual obligations, as the parties had agreed.

3.    On January 23, 2019, Byton's Board held a meeting in which, without warning or cause, it inexplicably removed Breitfeld as CEO and replaced him with Kirchert. The change was not just a superficial change in job title. Instead, the Byton Board fundamentally changed Breitfeld's job duties at that meeting. Breitfeld was removed as the head of the Executive Committee, management team and daily operations, and those duties were re-assigned to Kirchert. When confronted with the fact that Byton had breached the Employment Contract by removing Breitfeld as CEO and unilaterally changing his job duties, Byton offered no justification, and instead told Breitfeld that he was removed not only as CEO of Byton, but also of all Byton-related entities, including Byton NA. Breitfeld was also removed as Adjunct Chief Architect of Byton.

4.    When Breitfeld sought the compensation he was rightfully owed under the Employment Contract as a result of his termination (actual or constructive), Byton refused to honor the Employment Contract. Deprived of the benefits of the employment he had accepted pursuant to the Employment Contract, Breitfeld was forced to leave Byton in April 2019.

5.    After he was forced out of Byton, Breitfeld continued to seek the compensation that Byton owed him under the Employment Contract. Breitfeld and Byton exchanged correspondence detailing Breitfeld's various claims under the Employment Contract. Byton refused to pay him. Instead, after months of discussions, in August 2019, Byton and Byton NA filed a preemptive lawsuit against Breitfeld, falsely claiming he had stolen trade secrets and poached their employees. Breitfeld

1  now brings these counterclaims to obtain the compensation to which he is entitled

2  pursuant to the Employment Contract, under which Breitfeld fully performed until he

3  was terminated without any valid justification.

4  <u>**PARTIES**</u>

5       6.    Defendant and Counterclaimant Carsten Breitfeld is a natural person, who

6  resides and is domiciled in California, where he worked for Counterdefendants.

7  Breitfeld is a world-renowned expert in electric mobility with an unparalleled track

8  record in the industry.  Breitfeld is the primary architect of the BMW i8 electric car, a

9  groundbreaking industry advance, completed in a mere 38 months.  Following this

10  tremendous success, Breitfeld was recruited to co-found Byton, where he was initially

11  appointed to serve as Chairman and CEO.  Unfortunately, serious management and

12  other issues arose almost immediately at Byton.  Ultimately, after the Byton board

13  removed Breitfeld as CEO, based largely on false pretenses, Breitfeld left Byton to join

14  Iconiq.  Breitfeld was at Iconiq for only four months, before becoming Global CEO at

15  Faraday Future, a California-based global shared intelligent mobility company focused

16  on the development of electric vehicles.  At Faraday Future, Breitfeld currently heads

17  the executive leadership in charge of the production of the company's luxury FF 91

18  electric vehicle and the final development of its FF 81 mass market electric vehicle.

19       7.    Breitfeld is informed and believes and on that basis alleges that Plaintiff

20  and Counterdefendant Byton Limited is a Hong Kong company with its registered

21  office in Hong Kong and global headquarters in Nanjing, China.  Byton designs,

22  develops and manufactures electric vehicles.

23       8.    Breitfeld is informed and believes and on that basis alleges that Plaintiff

24  and Counterdefendant Byton North America Corporation is a Delaware corporation

25  with its principal place of business in Santa Clara County, California.  Byton NA is a

26  subsidiary of Byton and its North American headquarters.  Byton NA develops and

1  oversees Byton's operations in the North American market, including research and

2  development, marketing and business development.

3      9.    Breitfeld is informed and believes, and on that basis alleges, that at all

4  times mentioned herein, each and every Counterdefendant was the agent, servant,

5  employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other

6  Counterdefendant and, that in performing or failing to perform the acts herein alleged,

7  each was acting individually as well as through and in the foregoing alleged capacity

8  and within the course and scope of such agency, employment, joint venture,

9  partnership, subsidiary and/or conspiracy, and each other defendant ratified and

10  affirmed the acts and omissions of the other Counterdefendants.  Counterclaimant is

11  further informed and believes that each Counterdefendant, in taking and/or ratifying the

12  actions alleged herein, acted within the course and scope of such authority and, at the

13  same time, for their own financial and individual advantage, as well as in the course

14  and scope of such employment, agency and as an alter ego therein.

15  **<u>JURISDICTION AND VENUE</u>**

16      10.    This Court has original jurisdiction over Byton and Byton NA's second

17  cause of action for violation of the federal Defense of Trade Secrets Act ("DTSA"), 18

18  U.S.C. §§ 1836 et seq., which is a statutory claim "arising under" the laws of the United

19  States.  *See* 28 U.S.C. § 1331.  Plaintiffs' remaining claims are brought under California

20  state law, which arise from the same facts and "are so related to" the DTSA claim that

21  they "form part of the same case or controversy under Article III of the United States

22  Constitution."  28 U.S.C. § 1367.  Specifically, Plaintiffs allege that Breitfeld

23  misappropriated confidential information, poached their employees and "breach[ed] []

24  his fiduciary duties and duties of loyalty to Byton[.]"  Complaint, ¶ 1.  Each of

25  Plaintiffs' claims arise out of Breitfeld's prior employment and board relationship with

26  Byton and Byton NA and the facts and circumstances relating to his departure from the

27  Byton entities.

28

11.     This Court has supplemental subject matter jurisdiction over Breitfeld's counterclaims pursuant to 28 U.S.C. § 1367, which "form part of the same case or controversy" as the claims asserted in the Complaint.  As with Plaintiffs' claims, Breitfeld's counterclaim for breach of contract and his other counterclaims arise out of his prior employment and board relationship with Byton and Byton NA and the facts and circumstances relating to his departure from the Byton entities.  Indeed, any adjudication of the parties' respective claims and counterclaims arise from a common nucleus of operative facts and Breitfeld's claims are compulsory in nature.  *See* Fed. R. Civ. Proc. 13(a)(1).

12.     Counterdefendants are subject to personal jurisdiction in California. Byton NA resides in California, conducts business in California, and is subject to general personal jurisdiction in this State.  Additionally, this action arises out of or relates to Counterdefendants' contacts with this forum.  Counterdefendants purposefully availed themselves of the benefits of this forum and directed their activities towards California by entering into an employment relationship with Breitfeld and then seconding him to Byton NA, requiring him to reside in and work out of California from on or about June 23, 2017, through the termination of the parties' relationship.  Breitfeld's job responsibilities in California included strengthening ties with Silicon Valley and otherwise furthering Byton's business interests in California and throughout North America.  The State of California has a strong interest in adjudicating the rights of residents of this state, and the assertion of jurisdiction over Counterdefendants is reasonable.

13.     Moreover, Byton and Byton NA consented to adjudication of this dispute by affirmatively filing suit against Breitfeld in Los Angeles County, California.  Their claims for misappropriation of trade secrets, breach of fiduciary duty, intentional and negligent interference with prospective economic advantage and their other claims arise directly out of, and are inexorably tied to, Breitfeld's Employment Contract.

Counterdefendants' claims are closely related to, and are based on obligations set forth in, the Employment Contract as amended. The Employment Contract sets forth in detail Breitfeld's purported obligations with respect to the treatment of confidential information, trade secrets, intellectual property, and the solicitation of Byton employees. Breitfeld's counterclaims are similarly based upon and arise out of the Employment Contract and the same facts and circumstances as Plaintiffs' claims.

14.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Breitfeld resides in this district. Moreover, Counterdefendants voluntarily chose to file suit in this venue.

## FACTUAL BACKGROUND

### A.    The Employment Contract

15.     In or around 2015, Breitfeld left BMW, where he had worked for 20 years and led the development of the groundbreaking i8 electric car, to co-found Byton, and develop an electric car for that company. Breitfeld co-founded Byton with Daniel Kirchert, who had been a colleague of his at BMW. Breitfeld was to be Byton's CEO and to lead its Executive Committee, management team and daily operations. Kirchert was to be President of Byton.

16.     Byton was initially named Future Mobility Corporation Limited ("FMC"). The company's name officially changed to Byton in or about January 2018. For ease of reference, these counterclaims generally refer to both "FMC" and "Byton" as "Byton."

17.     Because Breitfeld was leaving a stable job with an established company to work for a start-up, he wanted a written contract with Byton. Accordingly, on or about December 22, 2015, Breitfeld entered into the Employment Contract with Byton to serve as CEO, director and Chairman of the Board of Byton and its subsidiaries, as well as Adjunct Chief Architect of Byton.

18.     Specifically, the Employment Contract stated that:

19

> It is intended that [Byton] will establish a new company ("NewCo China") within Mainland China and subsidiaries ("Subsidiaries") in Asia, Europe and US ("New Group").  Within the next few years, an IPO of the NewCo should take place in Hongkong [*sic*].  Upon the establishment of the NewCo and Subsidiaries, Dr.-Ing.[1]  Carsten Breitfeld will hold the position of CEO of the New Group.  At the same time he will be appointed as director and chairman of the board of the NewCo and Subsidiaries respectively.

Employment Contract (attached as Exhibit A), ¶ 1(B).

19.    The parties agreed to certain terms as a condition of Breitfeld's employment, including that Breitfeld's employment would be for a fixed term of five years, which would commence by at least January 1, 2016, but no later than July 1, 2016.  Exhibit A (Employment Contract), ¶ 2.

20.    Byton's rights to terminate Breitfeld were limited under the Employment Contract, and Breitfeld's compensation was guaranteed.  Specifically, the parties agreed that "[Byton] shall not terminate the contract for any reason except that the project is not started."  Exhibit A (Employment Contract), ¶ 13(A).  Additionally, "[i]f the contract is terminated or ends no matter what reason (including automatic ending), [Byton] will pay the full financial entitlements under the Contract calculated based on net amounts, including the same remuneration (annual salary, pension, bonuses, insurance, benefits), etc."  *Id*., ¶ 13(B).  The only exception was if Breitfeld terminated the contract "on his own initiative."  *Id*.  These terms were critical to Breitfeld, as he was leaving BMW, an established company for which he had successfully worked for 20 years, for Byton.

21.    As compensation, the parties agreed that Breitfeld was guaranteed an annual net salary, a signing bonus, stock options, pension, an insurance allowance,

---

[1] "Dr.-Ing" is an acronym for "Doktoringenieur," a German engineering degree.

1  housing, company car, education fees, tax advice fees, a guaranteed salary for his wife[2]
2  and other benefits.  Exhibit A (Employment Contract), ¶¶ 4-10.

3      22.    Under paragraph 5 of the Employment Contract, Breitfeld had rights to
4  stock options that were granted to him upon joining Byton "without any conditions,
5  such as time proportionate allocation or performance."  Exhibit A (Employment
6  Contract), ¶ 5(A).  Byton was obligated to provide Breitfeld with "2.5% non-
7  conditional stock option . . . in the listing vehicle for the planned IPO in Hongkong [*sic*]
8  (the stock options will be granted after his joining without any conditions, such as time
9  proportionate allocation or performance)."  *Id.*

10      23.    The parties also agreed that Byton would purchase Breitfeld's stock
11  options if Breitfeld left the company "for any reason not attributable him."  Specifically,
12  the Employment Contract stated:

> In case the project does not take place as intended (including IPO is
> cancelled, listing vehicle is not established or without adequate value,
> Dr.-Ing. Carsten Breitfeld leaves for any reason not attributable to him,
> shareholders/structure is changed, etc.), Dr.-Ing. Carsten Breitfeld may
> within 6 months of the incident return/transfer all or parts of the stock
> options to [Byton] and [Byton] shall acquire them at the respective value
> at the time of return.
>
> The value at return shall be determined by a third party evaluation as
> appointed with both parties' consent and at [Byton's] expense.
>
> If at the time of return/transfer the listing vehicle is not set up or only has
> a value obviously not suitable for the project, the value of the stock options
> shall be determined as if they were shares in a listing vehicle that was set
> up with a reasonable capital.

*Id.* ¶ 5(C).

---

[2] Mrs. Breitfeld is a qualified dentist in Germany but could not practice when
Breitfeld was employed abroad, so Byton agreed to compensate her.

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

**B.      The Amendment to the Employment Contract**

24.      On or about January 31, 2018, Byton and Breitfeld entered into an amendment to the Employment Contract (the "Amendment," which is attached as Exhibit B).

25.      Among other things, the parties agreed that Breitfeld would be paid a net base salary of €565,250 (approximately $627,427.50) per annum, and a net annual deferred compensation to an aggregate maximum of €242,250 (approximately $268,897.50).  Exhibit B (Amendment), ¶ 3.

26.      The parties also agreed to increase Breitfeld's share of stock options from 2.5% to 2.8% of non-conditional stock options in the listing vehicle for the planned IPO.  Exhibit B (Amendment), ¶ 4.

27.      Breitfeld closely adhered to the Employment Contract and subsequent Amendment, and performed all duties required of him as CEO of Byton and its subsidiaries, including, but not limited to, leading the Executive Committee and management team, being responsible for daily operations, and overseeing product development and business strategy for Byton and its subsidiaries.

**C.      Byton Seconds Breitfeld to Byton NA**

28.      On or about June 23, 2017, Byton seconded Breitfeld to Byton NA to work out of that subsidiary's Santa Clara, California, office.  Breitfeld transferred his entire family for the secondment, moving his wife and children to California so he could work for Byton NA.

29.      On or about December 1, 2018, Byton and Breitfeld entered into the Secondment to Byton North America, Inc. (the "Secondment," which is attached as Exhibit C), in which Byton and Breitfeld agreed that Breitfeld would be CEO of Byton NA and work out of its Santa Clara office, while continuing his position as CEO of Byton and its other subsidiaries.  According to the Secondment, "all current terms of

employment shall remain unchanged." *Id*. ¶ 1. The Secondment had retroactive effect, lasting from June 23, 2017, until April 30, 2020, and was subject to extension. *Id*. ¶ 2.

30. During the secondment, Breitfeld led Byton's North American operations, including overseeing marketing, business development and research and development efforts for Byton.

**D. Byton and Breitfeld Orally Modify Employment Agreement to Provide Restricted Shares in Lieu of Options, Subject to Anti-Dilution**

31. In 2018, Breitfeld, Kirchert and Matt Barter ("Barter"), Byton's General Counsel, discussed "non-conditional stock option" provisions in the Employment Contract. On information and belief, Kirchert's employment agreement reflected a "Stock Option" term similar to paragraph 5 of the Employment Contract. Breitfeld and Kirchert expressed the concern that contractually promised IPO option grants would be overly complicated and probably diluted, in light of the various funding rounds leading up to Byton's anticipated IPO. During a meeting in Munich in May 2018, the parties – Breitfeld and Kirchert, on the one hand, and Barter on behalf of Byton, on the other hand – orally agreed that Breitfeld and Kirchert would receive restricted share awards instead of stock options; they further agreed that such awards would be protected against dilution to ensure each would receive the full measure of the contractually promised equity percentage. Pursuant to Breitfeld's Employment Contract, Breitfeld was promised 2.8% of the total shares. On information and belief, Kirchert's share was 1.5 or 1.7%.

32. Byton therefore entered into an oral agreement with Breitfeld and Kirchert that each would receive a percentage of shares in order to protect them against dilution. With respect to Breitfeld, Byton agreed that Breitfeld would receive 2.8% of the total shares.

**E. Byton Terminates Breitfeld Without Cause**

33. On or about January 23, 2019, Byton held its Fifteenth Annual Board

Meeting ("Board Meeting"). [3]  At the Board Meeting, the Board of Byton (the "Board") resolved to replace Breitfeld as CEO of "the Company," and to allow him to continue only as Chairman.  Kirchert was named the new CEO.  The resolution was not just a change in job title; the Board also re-allocated Breitfeld's duties.  For example, the Board resolved that Kirchert, as the new CEO, would "Lead the Executive Committee and the management team" and "lead the daily operation of the company," despite the fact that Breitfeld had previously performed those duties, which were fundamental to Breitfeld's Employment Contract.    Breitfeld would not have entered into the Employment Contract absent these leadership roles.

34.    On or about February 11, 2019, Breitfeld emailed Pang Bo ("Bo"), Secretary of Byton, seeking clarification of the resolution passed at the Board Meeting and, in particular, whether the Board intended to remove Breitfeld as CEO of all Byton entities, including Byton, Byton GmbH and Byton NA.  After pressing for an answer by further email of February 12, 2019, Bo replied by email on February 13, 2019 that: *"The internal governance of FMC Cayman [Byton's parent] does not provide for a separate CEO position for each of the Company's offices or legal entities.  Rather the board's appointment of CEO applies universally to all Company activities.  Consequently, the board decision passed on January 23, 2019 is also effective on the Company entities referred to in your email."*

35.    Pursuant to paragraph 14(B) of the Employment Contract, which requires that, "in the event of any dispute, controversy or claim arising out of or in connection with this Contract, the Parties shall seek a settlement by friendly consultation," beginning on or about February 2019, Breitfeld reached out to Byton to seek his rightful position and financial entitlements owing to him under the Employment Contract.  During this period, Breitfeld undertook such duties for and on behalf of Byton and

---

[3] The Board Meeting was held in the name of Byton's parent, FMC Cayman, whose board was at that time synonymous with Byton's Board.

related entities, including Byton NA, as required, but never accepted any changed position; nor agreed that Byton was entitled to unilaterally alter the Employment Contract by removing him as CEO or Adjunct Chief Architect or by otherwise fundamentally changing his job duties. Breitfeld made his refusal to agree to Byton's unilateral changes in his job duties and title known to Byton by email and letter.

36. By April 15, 2019, it had become apparent that Counterdefendants would not allow Breitfeld to continue in an executive role consistent with the Employment Contract and with his previous responsibilities as CEO and Adjunct Chief Architect. Breitfeld was deprived of meaningful roles in the daily operations and business strategy of Byton and Byton NA, as the parties had agreed and as Breitfeld previously had performed. Instead, Counterdefendants demoted Breitfeld to a figurehead role with limited duties in capital raising efforts and public relations, and the perfunctory title of "Chairman." These actions constituted actual or constructive termination, in breach of the Employment Contract.

37. In April 2019, Byton unilaterally terminated Breitfeld's employment before the expiration of his fixed five-year employment term, breaching the Employment Contract.

**E.     Byton Fails to Compensate Breitfeld or Purchase His Stock Option**

35. As a result of Byton's termination of him, pursuant to the Employment Contract and subsequent Amendment and oral modification, Breitfeld should have received the full financial entitlements the parties agreed to, including, but not limited to, the remainder of his annual net salary in the amount of at least €2,310,770.60 (approximately $253,676.88); deferred compensation benefits in the amount of at least €228,537.73 (approximately $251,391.50); the balance of any annual leave in the amount of at least €106,650.92 (approximately $118,382.52); home trip expenses of €16,000 (approximately $17,760); pension insurance in the amount of at least €2,400,000 (approximately $2,664,000); German pension in the amount of at least

€78,000 (approximately $86,580); tax advice the value of which is at least €16,000 (approximately $17,760); housing, cars, driver, school fees in the amount of at least $401,000; guaranteed salary for his wife in the amount of at least €977,354.72 (approximately $1,084,863.74), as well as purchase of the equity interest that he was awarded pursuant to the Employment Contract and Amendment, as orally modified by the parties.  The value of the equity interest was to be determined by an assessor, pursuant to the Employment Contract.  To the extent that Byton terminated the Employment Contract, Breitfeld's equity interest should be fully vested.

36.    Breitfeld has made numerous attempts to recover the compensation he is owed pursuant to the parties' agreements.  Among other things, he has formally requested that Byton acquire his equity interest and proposed a nomination for the appointment of an assessor to determine the value of his shares, pursuant to paragraph 5(C) of the Employment Contract.  Byton, however, has consistently refused to perform its obligations.

**F.    Byton Sues Breitfeld in California, Waiving Venue, Choice of Law**

37.    On August 28, 2019, Counterdefendants filed this preemptive lawsuit asserting eight causes of action against Breitfeld.  The Complaint does not discuss any of the financial entitlements owed to Breitfeld under the Employment Contract as amended, or the months that Breitfeld has spent months trying to recover that compensation from Counterdefendants.  Instead, they (falsely) allege that Breitfeld stole confidential information and trade secrets, and wrongfully solicited their employees.

38.    Although the Employment Contract was amended to be governed by Hong Kong law and included a Hong Kong choice-of-forum clause, Counterdefendants voluntarily waived those provisions by filing suit in this forum under federal and California state law.  Their claims clearly arise out of, relate to, and are connected with, the Employment Contract and its Amendment.  The Employment

Contract created an employment and management relationship between the parties and set forth certain rights and duties of the parties.  In fact, the Amendment included detailed provisions relating to the treatment of confidential information and trade secrets, as well as the solicitation of Byton employees.  *See* Exhibit B (Amendment), ¶¶ 5-8.  Counterdefendants' various claims for, inter alia, misappropriation of trade secrets, breach of fiduciary duty, intentional interference with contractual relations are factually and legally intertwined with the contractual relationship established by the parties' agreements and the terms of those agreements.

39.     Counterdefendants have availed themselves of the benefits of the law of this forum by voluntarily bringing suit in this forum and asserting causes of action against Breitfeld under federal and state law.  For the past nine months since this lawsuit was filed, Counterdefendants have litigated their claims under federal and California state law and opposed a motion to dismiss on that basis.  Having been sued in this forum, Breitfeld brings the counterclaims below.

40.     Breitfeld contends that his counterclaims are governed by California law. Counterdefendants have waived any choice of law or choice of forum provisions by bringing suit in this forum under federal and California state law.  California has a materially greater interest than Hong Kong in the adjudication of this dispute. Breitfeld's claims arise out of his employment relationship during a time period when he resided and worked out of Byton NA's Santa Clara, California office, which implicates important policy interests of the State of California.  Thus, Breitfeld's claims are governed by California state law.  Indeed, it is for these reasons that Counterdefendants initiated this proceeding in the State of California.

41.     However, even if the Court were to apply Hong Kong law to any of Breitfeld's counterclaims, Hong Kong law also provides him with the relief to which he is entitled, as alleged below.

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

## **FIRST COUNTERCLAIM FOR DECLARATORY RELIEF**

### **(Against All Counterdefendants)**

42.  Breitfeld incorporates herein by reference each and every allegation contained in all preceding paragraphs.

43.  Issue a declaration that Counterdefendants breached the Employment Contract and Amendment by terminating, constructively or actually, his position as CEO and Adjunct Chief Architect, and that Breitfeld is entitled to all benefits, including, but not limited to, the remainder of his annual net salary, deferred compensation benefits, pension insurance, German pension, annual leave, home trip expenses, tax advice, housing, cars, driver, school fees for his children, guaranteed salary for his wife, and a repurchase of all of his equity interest.

44.  Issue a declaration that Counterdefendants constructively terminated Breitfeld from all roles and responsibilities in Byton and its related entities.

## **SECOND COUNTERCLAIM FOR BREACH OF CONTRACT**

### **(Against Byton)**

45.  Breitfeld incorporates herein by reference each and every allegation contained in all preceding paragraphs.

46.  Both California and Hong Kong law recognize breach of contract claims and require proof of similar elements.  "The essential elements of a claim of breach of contract" under California law "are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." *Green Valley Landowners Assn. v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015); *compare with Willcox v. Lloyds TSB Bank, PLC*, No. CV 13-00508 ACK-RLP, 2016 WL 593458, at *5–6 (D. Haw. Feb. 11, 2016) ("[t]o prevail on a breach of contract claim under Hong Kong law, a plaintiff must establish (1) that there were express or implied contractual terms requiring the defendant to act in some manner, and (2) that the defendant has acted contrary to those express or implied terms")

(internal citations omitted).

47.     As alleged herein, Byton and Breitfeld entered into the Employment Contract, whereby Breitfeld agreed to act as CEO, director and Chairman of Byton and its subsidiaries, including Byton NA, as well as Adjunct Chief Architect of Byton, commencing at the earliest January 1, 2016, and at the latest July 1, 2016, and lasting for a five-year term.   In exchange, Breitfeld would receive compensation that included an annual salary; deferred compensation; pension insurance; German pension; annual leave; home trip expenses; tax advice; housing, cars, and driver; school fees for his children; a signing bonus; stock options; and a guaranteed salary for his wife, among other compensation.  The Employment Contract provided that Byton would purchase Breitfeld's stock options and/or equity interest if he left the company.  The Employment Contract provided that Byton "shall not terminate the contract for any reason except that the project is not started."  The Employment Contract further stated that if the contract "is terminated or ends no matter what reason (including automatic ending)," other than by Breitfeld's "own initiative," Byton "will pay the full financial entitlements under the Contract calculated based on net amounts, including the same remuneration (annual salary, pension, bonuses, insurance, benefits), etc."

48.     In 2018, Byton and Breitfeld orally modified the Employment Contract to replace the promised stock option grant with an award of restricted shares equal to 2.8% of all outstanding shares; Byton also orally agreed to protect the restricted share grant against dilution.

49.     Breitfeld performed all of his obligations required by the Employment Contract and its subsequent Amendment and oral modification with Byton, except where such obligations were excused by Byton's breach.

50.     Byton breached the Employment Contract by discharging Breitfeld from his position as CEO of Byton and Byton-related entities, including, Byton GmbH and

Byton NA, and as Adjunct Chief Architect of Byton, and unilaterally changing his job duties.  Additionally, Byton failed to pay the compensation owed to Breitfeld under the Employment Contract and subsequent Amendment and oral modification, including his annual salary; deferred compensation; pension insurance; German pension; annual leave; home trip expenses; tax advice; housing, cars, and driver; school fees for his children; a guaranteed salary for his wife; and the purchase of his stock options and/or equity interest, among other compensation.

51.     Byton further breached the Employment Contract by failing to agree to the appointment of a third-party evaluator to assess the value of his stock options and/or equity interest, in accordance with paragraph 5(C) of the Employment Contract, despite Breitfeld's written request.

52.     As a direct and proximate result of Byton's breach, Breitfeld has suffered damages according to proof in an amount of at least €6,586,443.97 (approximately $7,310,952.81), in wages and other benefits, and an additional amount to be determined for his equity interests that is well in excess of the jurisdictional minimum of this court.

## THIRD COUNTERCLAIM FOR BREACH OF IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Byton)

53.     Breitfeld incorporates herein by reference each and every allegation contained in all preceding paragraphs.

54.     Under California law, the implied covenant of good faith and fair dealing [is] implied by law in every contract.  *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013).  "The covenant is read into contracts and functions "as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits

of the contract." *Id*. (internal quotations omitted).

55. Although Hong Kong law "does not require a court to read into every contract an implied term requiring parties to act in good faith[,]" an implied obligation of good faith may be implied in certain circumstances to "constrain[]" the exercise of a party's "discretion[.]" *Willcox*, 2016 WL 593458, at *14 (internal quotations omitted). On information and belief, in the context of employment contracts, there can be an implied duty of good faith which requires a party to a contract to exercise its power in good faith, rationally and for a proper purpose to give effect to the reasonable expectations of the parties to a contract.

56. Implied in the Employment Contract between Breitfeld and Byton is a covenant of good faith and fair dealing. Pursuant to such covenant, Byton agreed not to do anything to deprive Breitfeld of the benefits of the Employment Contract and subsequent Amendment and oral modification.

57. Breitfeld has performed all of his obligations required by the Employment Contract and subsequent Amendment, except where such obligations were excused by Byton's breach.

58. Through Byton's actions described above, including its unilateral decision to remove Breitfeld from his position as CEO and Adjunct Chief Architect and alter his job duties, Byton has deprived Breitfeld of the benefits of the Employment Contract and subsequent Amendment.

59. As a direct and proximate breach of the implied covenant of good faith and fair dealing in the Employment Contract and subsequent Amendment, Breitfeld has suffered damages in an amount to be proven at trial.

## FOURTH COUNTERCLAIM FOR VIOLATION OF BUSINESS & PROESSIONS CODE SECTION 17200, *et seq.*

### (Against All Counterdefendants)

60. Breitfeld incorporates herein by reference each and every allegation

1  contained in all preceding paragraphs.

2       61.   Section 17200, *et seq*., of the California Business & Professions Code is

3  written in the disjunctive and broadly covers three varieties of unfair competition –

4  acts that are unlawful, or unfair, or fraudulent.

5       62.   Breitfeld is a "person" within the meaning of California Business &

6  Professions Code § 17201.

7       63.   Out-of-state businesses are liable under California Business &

8  Professions Code section 17200, *et seq*., for wrongful business conduct affecting

9  California employees.  *Application Group v. Hunter Group*, 61 Cal. App. 4th 881,

10  906 (1998); *Arkley v. Aon Risk Services Companies, Inc*., 2012 WL 2674980, at *3

11  (C.D. Cal. June 13, 2012).

12       64.   As alleged herein, Counterdefendants' conduct constitutes "unfair"

13  business practices.  A practice may be deemed unfair even if not specifically

14  proscribed by some other law.  Conduct that significantly threatens or harms

15  competition may be deemed to be "unfair."

16       65.   As alleged herein, Counterdefendants' conduct is also "unlawful."

17  Within the meaning of Section 17200, virtually any violation of any civil or criminal

18  federal, state or municipal, statutory, regulatory, court-made, or local law can serve as

19  a predicate for an "unlawful" claim.

20       66.   By reason of, and as a direct and proximate result of Counterdefendants'

21  unfair and unlawful practices and conduct, Breitfeld has suffered and will continue to

22  suffer, financial injury to his business and property due to Counterdefendants' failure

23  to pay unpaid wages.

24       67.   Counterdefendants' unfair and unlawful conduct has caused economic

25  harm to Breitfeld, competition and consumers.

26       68.   "[O]rders for payment of wages unlawfully withheld from an employee

27  are . . . a restitutionary remedy authorized by section 17203 [of the Business and

28

Professions Code]." *Cortez v. Purolator Air Filtration Products Co*., 23 Cal. 4th 163, 177 (2000).

69.    Pursuant to Business & Professions Code section 17200, *et seq*., Breitfeld is entitled to restitution in the amount of unpaid wages in an amount to be determined at trial.

## **FIFTH COUNTERCLAIM FOR QUANTUM MERUIT**
### **(Against All Counterdefendants)**

70.    Breitfeld incorporates herein by reference each and every allegation contained in all preceding paragraphs.

71.    Under California law, "[q]uantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered." *Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.*, 24 Cal. App. 5th 153, 180 (2018).  On information and belief, Hong Kong law provides a similar restitutionary remedy where a party has been enriched at the expense of another.

72.    At Counterdefendants' request, Breitfeld provided valuable services to each of the Counterdefendants, including without limitation as alleged above, and in so doing, Breitfeld conveyed an actual benefit on Counterdefendants by reason of the services Breitfeld provided, and including without limitation that, with full appreciation of the facts, Counterderfendants unjustly have retained the actual benefit of Breitfeld's services, including that Counterdefendants have earned or will earn significant profits due to Breitfeld's work.

73.    The reasonable value of the services Breitfeld provided is subject to proof but is in excess of €6,586,443.97 (approximately $7,310,952.81), in wages and other benefits, and an additional amount to be determined for his equity interests well in excess of the jurisdictional minimum of this court.  Counterdefendants have failed and refused to pay Breitfeld such amounts.

74.     Breitfeld is entitled to recover herein the reasonable value of the services he provided to Counterdefedants in an amount subject to proof in excess of €6,586,443.97 (approximately $7,310,952.81), in wages and other benefits, and an additional amount to be determined for his equity interests well in excess of the jurisdictional minimum of this court.

75.     Payment to Breitfeld of the foregoing amounts for the reasonable value of his services is necessary in order to prevent unjust enrichment of Counterdefendants.

76.     As a direct legal result of Counterdefendants' conduct described above, Counterdefendants have been and will continue to be unjustly enriched with ill-gotten gains in that, inter alia, they are in receipt and possession of Breitfeld's wages and other renumeration.

## SIXTH COUNTERCLAIM FOR VIOLATIONS OF
## LABOR CODE §§ 201, 203

**(Against All Counterdefendants)**

77.     Breitfeld incorporates herein by reference each and every allegation contained in all preceding paragraphs.

78.     "Both the plain terms of the California Labor Code and California Supreme Court precedent confirm that the California Labor Code applies to work performed in California.  The preamble to California's Labor Code provides that its protections 'are available to all individuals . . . [] who are or who have been employed, in this state.'" *Bernstein v. Virgin America, Inc.,* 227 F. Supp.3d 1049, 1061 (N.D. Cal. 2017) (applying California law) (quoting Cal. Labor Code § 1171.5). California Labor Code section 219 declares that "no provision in this article [including sections 201 and 203] can in any way be contravened or set aside by private agreement, whether written, oral or implied." California has a strong public policy against enforcing choice-of-law provisions that would abrogate the right to

1   pursue remedies.  *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1361 (N.D.
2   Cal. 2007) (applying California law).

3        79.    California Labor Code section 201 requires employers to pay their
4   employees all wages due immediately upon discharge or resignation.  Labor Code
5   section 203 provides that if an employer willfully fails to pay compensation promptly
6   upon discharge or resignation, as required under section 201, then the employer is
7   liable for waiting time penalties in the form of continued compensation for up to
8   thirty (30) workdays.

9        80.    Breitfeld is no longer employed by Counterdefendants and has not
10  received such compensation.  More than 30 days have passed since Breitfeld has left
11  Counterdefendants' employ.

12       81.    Breitfeld is, accordingly, entitled to restitution and penalties as provided
13  by California Labor Code section 203.

14             **SEVENTH COUNTERCLAIM FOR WRONGFUL TERMINATION**
15                **IN VIOLATION OF LABOR CODE § 2924**
16                  **(Against All Counterdefendants)**

17       82.    Breitfeld incorporates herein by reference each and every allegation
18  contained in all preceding paragraphs.

19       83.    "Both the plain terms of the California Labor Code and California
20  Supreme Court precedent confirm that the California Labor Code applies to work
21  performed in California.  The preamble to California's Labor Code provides that its
22  protections 'are available to all individuals . . . [] who are or who have been
23  employed, in this state.'"  *Bernstein,* 227 F. Supp. 3d at 1061 (applying California
24  law) (quoting Cal. Labor Code § 1171.5).  Further, California Labor Code section 219
25  declares that "no provision in this article [including section 2924] can in any way be
26  contravened or set aside by private agreement, whether written, oral or implied."
27  California has a strong public policy against enforcing choice-of-law provisions that

28

would abrogate the right to pursue remedies.  *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1361 (N.D. Cal. 2007) (applying California law).

84.     Labor Code section 2924 allows termination of an employment for a specified term only "in case of any willful breach of duty . . . habitual neglect of . . . duty or continued incapacity to perform it."

85.     At all relevant times, Breitfeld's employment with Counterdefendants was governed by the Employment Contract, which had a specified term of five years, and the Secondment, which had an employment term of 2.85 years.  The Employment Contract stated that Counterdefendants could only terminate Breitfeld "if the project was not started."  The Amendment did not alter this contractual obligation.

86.     During Breitfeld's employment, Breitfeld did not commit a willful breach of duty in the course of his employment, nor did he commit habitual neglect of his duty or demonstrate a continued incapacity to perform his duty.

87.     Counterdefendants violated Section 2924 by terminating Breitfeld's employment as CEO and Adjunct Chief Architect of Byton and CEO of related Byton entities, including Byton GmbH and Byton NA, without cause.

88.     As a result of the Counterdefendants' unlawful actions, Breitfeld has suffered losses in income, earnings, benefits and other consequential damage in a sum to be shown according to proof.

89.     Counterdefendants are also liable for civil penalties incurred in violating Labor Code section 2924.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counterclaimant Breitfeld prays for judgment as follows:

1.     Compensatory and consequential damages, in an amount to be proven at trial;

2.     For restitution, in an amount to be proven at trial;

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

3.   For statutory damages, in an amount to be proven at trial;

4.   For punitive and exemplary damages, in an amount to be proven at trial;

5.   For unjust enrichment, in an amount to be proven at trial;

6.   For attorneys' fees and costs, as permitted by law;

7.   For pre- and post-judgment interest at the legal rate; and

8.   For such other and further relief as the Court may deem just and proper.

Dated: May 19, 2020                        BAKER MARQUART, LLP

                                By: _____
                                           Ryan G. Baker

                                *Attorneys for Defendant and*
                                *Counterclaimant Carsten Breitfeld*

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

## **DEMAND FOR JURY TRIAL**

Defendant and counterclaimant Carsten Breitfeld hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Local Rule 38-1.


Dated: May 19, 2020                         BAKER MARQUART, LLP

By:  _____
                              Ryan G. Baker

*Attorneys for Defendant and*
*Counterclaimant Carsten Breitfeld*

CARSTEN BREITFELD'S
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

# EXHIBIT A

# Contract

**Private & Confidential**

Date:  Dec 22nd,2015

This contract is entered by and between **FUTURE MOBILITY CORPORATION LIMITED,** registered address on 19/F Two IFC, 8 Finance Street Central, Hong Kong (referred to as "**FMC**")

And

**Dr.-Ing. Carsten Breitfeld,** Tannenstrasse 25c, 85640 Putzbrunn ( Passport NO: CF9JC25T1 ).

Both parties mutually negotiated and agreed as follows:

1.  **Position**

A). FMC is pleased to offer Dr.-Ing. Carsten Breitfeld the position of CEO and Adjunct Chief Architect.

B). It is intended that FMC will establish a new company ("NewCo China") within Mainland China and subsidiaries ("Subsidiaries") in Asia, Europe and US ("New Group").  Within the next few years, an IPO of the NewCo should take place in Hongkong. Upon the establishment of the NewCo and Subsidiaries, Dr.-Ing. Carsten Breitfeld will hold the position of CEO of the New Group. At the same time he will be appointed as director and chairman of the board of the NewCo and Subsidiaries respectively.

C). His responsibilities as CEO will comprise the support of the establishment of the New Group. He will hold the technical responsibility and be in charge of engineering, production and supply chain.

D). FMC shall provide Dr.-Ing. Carsten Breitfeld with all information and documentation that is necessary for carrying out its duties.  During the Term of this Contract, FMC will provide a translator to Dr.-Ing. Carsten Breitfeld, as required.

2.  **Effective Date and Contract Period**

The Contract will be effective upon signing, and commencement date will be earliest 1 January, 2016 or later as agreed by the parties, latest 1 July 2016, and the contract period will be five years ("Term").

3.  **Work Location and Travel**

A). Dr.-Ing. Carsten Breitfeld's work location will be in Shenzhen. He will also have an office in Hongkong. FMC can request Dr.-Ing. Carsten Breitfeld to travel out of Shenzhen when reasonable and appropriate.

B). FMC will reimburse Dr.-Ing. Carsten Breitfeld for any reasonable expenses incurred for the due performance of his duties. He will be entitled to travel first class or business class on national and international flights.

4.  **Annual Salary, Pension, Insurance Allowance and Signing Bonus**

**(1) Annual Salary**

Dr.-Ing. Carsten Breitfeld's annual salary will be (net) €807,500.

**(2) Pension**

A). FMC will provide Dr. Carsten Breitfeld a pension insurance with the same standards and benefits as he has currently (€ 11,000 per month and his wife being the beneficiary). FMC will, on a monthly basis, pay contributions to an insurance with a reputable international insurance company as approved by him, to maintain a pension insurance which guarantees Dr. Carsten Breitfeld a lifelong pension in the amount of € 11,000 per month as of the age of 60. The pension will be continued in accordance with the insurance plan and pay-out will be provided as of the age of 60, regardless whether the Term of the Contract will be extended. In case of early resignation without reason within the initial Term of 5 years, FMC may end the monthly payments to the insurance company, however, the proportionate pension entitlement as acquired in accordance with the insurance plan at the time of leaving (may be less than EUR 11,000 per month) will be paid out as of the age of 60.

B). FMC will pay (net) € 3,000 per month for Dr.-Ing. Carsten Breitfeld's German national pension insurance after his attendance; if direct payment to the statutory account on his behalf is not possible, payment will be transferred to his bank account.

**(3) Insurance Allowance**

FMC will reimburse Dr.-Ing. Carsten Breitfeld's for his and his family's premiums for global medical insurance, currently € 1,875 per month. Any tax will be borne by FMC.

**(4) Signing Bonus**

FMC will within 10 days after his attendance pay compensation for Dr.-Ing. Carsten Breitfeld's loss of his current bonus entitlement payable in 2016. The bonus compensation would amount to € 440,000 gross (374,000 net) in total and will be reduced on a pro-rated basis in case of joining during 2016 , i.e. when joining in March 2016 compensation will be provided in the amount of 10/12 of € 374,000 (net), when joining in April 2016 compensation will be provided in the amount of 9/12 of € 374,000 (net), when joining in May 2016 compensation will be provided in the amount of 8/12 of € 374,000 (net), when joining in June 2016 compensation will be provided in the amount of 7/12 of € 374,000 (net), when joining on 1 July compensation will be provided in the amount of 6/12 of € 374,000 (net).

All of the above payments, including annual salary, pension, insurance allowance and signing bonus, will be paid to a bank account of Dr.-Ing. Carsten Breitfeld in Hongkong or Europe as designated by him. Conversion of EUR to another currency will be made at the exchange rate published by the Bank of China on the date of remittance.

**5. Stock Option**

A). FMC will provide 2.5% non-conditional stock option to Dr.-Ing. Carsten Breitfeld in the listing vehicle for the planned IPO in Hongkong (the stock options will be granted after his joining without any conditions, such as time proportionate allocation or performance).

B). A detailed stock option agreement will be signed separately.

C). In case the project does not take place as intended (including IPO is cancelled, listing vehicle is not established or without adequate value, Dr.-Ing. Carsten Breitfeld leaves for any reason not attributable to him, shareholders/structure is changed, etc.), Dr.-Ing. Carsten Breitfeld may within 6 months of the incident return/transfer all or parts of the stock options to FMC and FMC shall acquire them at the respective value at the time of return.

The value at return shall be determined by a third party evaluation as appointed with both parties' consent and at FMC's expense.

If at the time of return/transfer the listing vehicle is not set up or only has a value obviously not suitable for the project, the value of the stock options shall be determined as if they were shares in a listing vehicle that was set up with a reasonable capital.

### 6.   Working Hours

Dr.-Ing. Carsten Breitfeld is in general required to work 5 days per week with approx. 1 hour per day for lunch time. If necessary, Dr.-Ing. Carsten Breitfeld is required to work overtime. Dr.-Ing. Carsten Breitfeld shall be entitled to arrange his working time and rest time independently and according to the requirements of his position.

### 7.   Other Benefits

A).   FMC will support Dr.-Ing. Carsten Breitfeld's wife to find an adequate and suitable job in Shenzhen or Hongkong, where her annual salary is no less than her current annual salary of approx. (pretax) € 250,000 and also covers her pension of  (pretax) € 2,500 per month. If her future annual income is less than (net) €17,708 per month (€ 212,500 per year) plus pension of € 2,125 (net) per month, FMC will make up the balance.

B).   FMC will rent an adequate house as chosen by him for Dr.-Ing. Carsten Breitfeld and his family in Hongkong.

C). FMC will provide a company car (BMW7) with a double number plate for Mainland China and Hongkong, and driver to Dr.-Ing. Carsten Breitfeld, and another appropriate car for his wife in Hongkong. Any tax applicable will be borne by FMC.

D). FMC will pay the education fees (including the costs for selecting school and tuition fees) for Dr.-Ing. Carsten Breitfeld's child at an international school in Hongkong or Mainland China in accordance with his choice.

E). FMC will pay the reasonable fees for Dr.-Ing. Carsten Breitfeld's tax advice related to the payments under this Contract.

### 8.   Limitation of Liabilities and D&O Insurance

FMC shall provide D&O insurance cover for Dr.-Ing. Carsten Breitfeld. To the extent liability is not covered by the D&O insurance provider in a specific case, FMC shall indemnify and exempt him against and from all claims and liabilities incurred while performing his respective duties as CEO, chairman,

director or in any other corporate function or employee, provided that any acts or omissions by him which give rise to such claims and liabilities do not constitute intentional misconduct or gross negligence.

9.  **Annual Leave**

A). Dr.-Ing. Carsten Breitfeld is entitled to have thirty ( 30 ) days' paid annual leave per year. Leave can be taken only in coordination with the Board. Untaken leave will be carried forward into the following year and compensated and the end of the Contract Term.

B). In case of absence due to sick leave, FMC will continue payment of Dr.-Ing. Carsten Breitfeld's remuneration for up to 3 months per calendar year.

10. **Home Trip Expenses**

Dr.-Ing. Carsten Breitfeld and his family's traveling expenses back and forth between Germany and China in first class or business class three times per year will be reimbursed by FMC to the full amount in net upon provision of respective receipts.

11. **Working Arrangement during Typhoon**

Dr.-Ing. Carsten Breitfeld is not required to work when typhoon signal no.8 or above is hoisted and no remuneration will be deducted during the period. Dr.-Ing. Carsten Breitfeld is required to resume duty if the typhoon signal 8 is lowered not less than one hour before close of working hours.

12. **Working Arrangement during Black Rainstorm Warning**

Dr.-Ing. Carsten Breitfeld is not required to work when black rainstorm warning is hoisted and no remuneration will be deducted during the period. Dr.-Ing. Carsten Breitfeld is required to resume duty if the black rainstorm warning is lowered not less than one hour before close of working hours.

13. **Special Clause**

A). FMC shall not terminate the contract for any reason except that the project is not started.

B). If the contract is terminated or ends no matter what reason (including automatic ending), FMC will pay the full financial entitlements under the Contract calculated based on net amounts, including the same remuneration (annual salary, pension, bonuses, insurance, benefits), etc. If the contract is terminated by Dr.-Ing. Carsten Breitfeld on his own initiative, FMC will not provide these payments (as

stipulated in the before sentence) to compensate for the remaining contract period (however this does not impact the agreement regarding pension as stipulated in Article 4 (2)).

D). If the contract is not renewed after the agreed Term, FMC will provide severance pay in accordance with Chinese employment law, whereby no cap for the monthly remuneration shall apply.

E). FMC will support all relevant application and bear relevant costs for permits or visas required for the Dr.-Ing. Carsten Breitfeld and his family members (in Mainland China and any other relevant country). If the work permit in Mainland China is not obtained for any reason and Dr.-Ing. Carsten Breitfeld cannot perform his required work in Mainland China, FMC will provide same payments as in above B).

**14. Final Clauses**

A). The formation of this Contract, its validity, termination, interpretation, execution and settlement of any dispute arising hereunder shall be governed by the laws and regulations of PRC.

B). In the event of any dispute, controversy or claim arising out of or in connection with this Contract, the Parties shall seek a settlement by friendly consultation. If one or both Parties are not willing to conduct or continue such consultation or if the dispute, controversy or claim cannot be solved, the labour arbitration committee and people's court shall hold jurisdiction pursuant to the applicable PRC laws.

C). If the terms of this Contract conflict with the existing laws and regulations of PRC, the laws and regulations of PRC prevail. The national or Shenzhen local regulations apply to those issues which are not covered by this Contract or the Company's internal rules and regulations. If there are any conflicts between regulations in this Contract and the internal rules and regulations of the Company, the individual agreement in this Contract prevails.

D). The invalidity of any provision of this Contract shall not affect the validity of any other provisions of this Contract. In such circumstances the Parties shall use their reasonable endeavours to negotiate in good faith a valid and enforceable provision in substitution for the invalid provision, which shall reflect the legal and economic substance of the invalid or unenforceable provision as closely as possible.

Please confirm the acceptance of this appointment by signing and returning the enclosed duplicate copy of this letter.

FMC would like to take this opportunity of welcoming Dr.-Ing. Carsten Breitfeld and look forward to a long, rewarding and pleasant collaborative relationship.

Yours Sincerely

For and on behalf of

FUTURE MOBILITY CORPORATION LIMITED

Name: Changge Feng

Title:Director

(company chop)

I understand and accept the offer on the terms and conditions outlined in this contract.

Dr.-Ing. Carsten Breitfeld

# EXHIBIT B

Lippo Centre, Unit 1312, 13/F, Tower 1, 89 Queensway, Hong Kong
—
www.byton.com

Dr Cartsen Delf Breitfeld
German Passport No. CF9JF53TN
Tannenstrasse 25c, 85640 Putzbrunn, Germany

January 31, 2018

Dear Dr Breitfeld

**Amendment to your Employment Agreement dated 22 December 2015**

We refer to your employment agreement dated 22 December 2015 ("**Employment Agreement**"), which was entered into with Byton Limited (formerly known as "Future Mobility Corporation Limited"), a company registered in Hong Kong with registration number 2343755 and having its registered address at Unit 1312, 13/F, Tower 1, Lippo Centre, 89 Queensway, Admiralty, Hong Kong (the "**Company**").

It is hereby agreed that the Employment Agreement shall be amended as set out in this letter below. Terms in the Employment Agreement which are not affected by this Amendment shall remain unchanged.

1.   Party Description

The following description of the parties on page 1 of the Employment Agreement being:

"*This contract is entered by and between Future Mobility Corporation Limited, registered address on 19/F Two IFC, 8 Finance Street Central, Hong Kong (referred to as "FMC")*

*And*

*Dr.-Ing. Carsten Breitfled, Tannenstrasse 25c, 85640 Putzbrunn (Passport No: CF9JC25T1)*",

shall be deleted in its entirety and replaced with:

"*This Contract is entered into between:-*

(A)   ***Byton Limited (formerly known as "Future Mobility Corporation Limited")**, a company registered in Hong Kong with registration number 2343755 and having its registered address at Unit 1312, 13/F, Tower 1, Lippo Centre, 89 Queensway, Admiralty, Hong Kong (the "**Byton**" or the "**Company**"); and*

(B)   *Dr Carsten Delf Breitfeld, holding of German passport no. CF9JF53TN of Tannenstrasse 25c, 85640 Putzbrunn, Germany ("**Dr Breitfeld**")*"

2.   Work Location

Paragraph 3 (A) of the Employment Agreement shall be deleted in its entirety, and replaced with:

"*Dr Breitfeld's work location shall be Hong Kong.  Dr Breitfeld's responsibilities shall require him to travel to global Byton locations, including but not limited to Santa Clara, Nanjing, Shanghai and Munich.*"

3.   Annual Salary, Pension, Insurance and Signing Bonus
(i)   Paragraph 4(1) of the Employment Agreement shall be deleted in its entirety and replaced with:-

"**4.    Remuneration and benefits**

(1)   *Annual Salary and Deferred Benefits*

*Dr Breitfeld shall be paid a net base salary of EUR565,250 per annum. Dr Breitfeld's salary shall accrue from day to day at a rate of 1/260 of his annual base salary and be payable monthly in Euro ("EUR"). Dr Breitfeld's net monthly salary after deductions (if any) pursuant to this employment letter shall be paid in arrears each month directly into his designated bank account. Dr Breitfeld shall notify Byton in writing regarding any changes to the details of his designated back account.*

*Deferred Benefits*

*Dr Breitfeld shall also be entitled to a net annual deferred compensation to an aggregate maximum of EUR242,250 (which is calculated as 12 times EUR20,187.5 per month).*

*It is further agreed that the above defined deferred compensation shall be subject to achieving KPIs to be determined by the Byton's board of directors on an annual basis, in its sole discretion."*

4.   <u>Stock Option</u>

Paragraph 5(A) of the Employment Agreement shall be deleted in its entirety and replaced with:-

"A)  Dr Breitfeld shall be entitled to *2,800,000 (2.8%) of non-conditional stock options in the listing vehicle for the planned IPO in Hong Kong (the stock options will be granted after his joining without any conditions, such as time proportionate allocation or performance)*."

5.   <u>Notice</u>

The following sections shall be added to Paragraph 13 of the Employment Agreement (and existing clauses of Paragraph 13 shall remain unchanged):

*" 13.   **Termination of Employment***

F)   *Dr Breitfeld may terminate this letter of employment by serving Byton six (6) months' written notice. During this notice period, Dr Breitfeld shall continue to be paid his base salary and all contractual entitlements ("Notice Compensation").  This notice period may be shortened subject to agreement between the parties. Byton reserves the right to require Dr Breitfeld not to come to work during all or any part of this notice period ("garden leave"), in which case Dr Breitfeld shall continue to be paid his base salary and all contractual entitlements ("Garden Leave Compensation"). For the avoidance of doubt, the Notice Compensation and Garden Leave Compensation shall be grossed up to include any worldwide tax liability of Dr Breitfeld in relation to the Notice Compensation and Garden Leave Compensation.  In addition, during all or any part of this notice period, Byton may require Dr Breitfeld to perform certain duties, require him not to have contact with clients as Byton shall determine, exclude him from participation in any of Byton's meetings or discussions, restrict his access to any documents or other property as Byton shall determine, exclude him from any premises of Byton and/or take other similar actions in light of the pending termination of his employment.*

G)   *On Dr Breitfeld's last day of work, or his last day before commencing a period of garden leave:*

i)   *he shall immediately deliver to Byton all documents, books, materials, records, correspondence, papers and information (on whatever media and wherever*

*located) relating to the business or affairs of Byton and its business contacts, any keys/access card, credit card and any other property of Byton (including, without limitation, any mobile phones, computers and/or car provided to him), which is in your possession or under your control; and*

ii)    *all company data (including work e-mails), and any software applications provided by Byton for business purposes, will be removed from any device in which they are stored (including your personal devices, if applicable), using software applied by the Byton's IT contractor. If this cannot be achieved remotely, the devices must be submitted to the Byton's IT contractor for wiping and software removal. Dr Breitfeld must provide all necessary co-operation and assistance to Byton's IT contractor in relation to this process. This provision is a condition of Dr Breitfeld's employment and important for the protection of the Byton's business. Dr Breitfeld acknowledges and agrees that Byton shall enforce this provision strictly."*

6.    <u>Restrictive Covenant</u>

Paragraph 14 of the Employment Agreement shall be deleted in its entirety and replaced with:-

**"14.    *Restrictive Covenants***

A)    *Dr Breitfeld acknowledges and agrees that in the course of his employment with Byton:*

i)    *he will or may have dealings with clients, suppliers and fellow employees over whom he may develop a degree of influence;*

ii)    *Byton invests a considerable amount of time, energy and money in training its employees and fostering relationships with clients, suppliers and customers and that those employees, clients, suppliers and customers and the general stability of the workforce form an important part of the goodwill of Byton; and*

iii)    *he will have access to and be entrusted with Confidential Information (as defined in paragraph 15).*

B)    *In order to safeguard Byton's clientele, goodwill and name and to protect Byton's legitimate proprietary interests Dr Breitfeld hereby covenants that during the Restricted Period he will not without the prior written consent of Byton:*

i)    *within Hong Kong and any other place or jurisdiction in which he has been involved in conducting business on behalf of Byton, carry on or be engaged, concerned or interested in (whether as a director, shareholder, principal, consultant, agent, partner or employee) or otherwise provide services to any business concern, trade or occupation (of whatever kind) which is (or intends to be) in competition with the Restricted Business; or*

ii)    *solicit or entice away or endeavour to solicit or entice away from Byton in connection with the carrying on of any business in competition with the*

*Restricted Business any client or customer or supplier of Byton or any Relevant Group Company with whom he has had business dealings or about whom he had been provided with Confidential Information in the course of his employment within the Relevant Period; or*

iii)     *in competition with the Restricted Business seek to procure orders from or do or transact and business with or have business dealings with any person, firm or company who has at any time during the Relevant Period done business with or been a client or customer or supplier of Byton and with whom he has had business dealings or about whom he had been provided with Confidential Information in the course of his employment within the Relevant Period; or*

iv)     *solicit or entice or endeavour to solicit or entice away from Byton or any Relevant Group Company any person who at the Termination Date is employed or engaged by Byton or any Relevant Group Company in a managerial, technical, IT, design or sales capacity, or is a key employee of Byton and with whom he has had dealings or directly managed or who reported to him or about whom he had been provided with Confidential Information at any time within the Relevant Period.*

*PROVIDED that nothing in this clause shall prohibit him from, in his own name or under that of his immediate family, acquiring or holding equity securities of a company which engages in business in competition with the Restricted Business and whose equity securities are traded on a national or regional recognized stock exchange or on the over-the-counter market, as long as the ownership of the equity securities represents less than 1% of such company's equity securities on a fully diluted basis.*

C)     *During the Restricted Period, a monthly non-competition compensation will be payable to Dr Breitfeld on the basis of his monthly average salary and all contractual entitlements for the Relevant Period, and in respect of and conditional upon compliance with Clause 14.(B)(i) ("**Non-Competition Compensation**").   For the avoidance of doubt, the Non-Competition Compensation shall be grossed up to include any worldwide tax liability of Dr Breitfeld in relation to the Non-Competition Compensation.*

D)     *Byton may, in its sole discretion decide not to enforce any or all of the restrictions in paragraph Clause 14(B)(i) and to release Dr Breitfeld from his obligations under that clause as specified above. No Non-Competition Compensation shall be payable by Byton to Dr Breitfeld in case Byton exercises its discretion under this paragraph 14(D) to release him from his non-competition obligations.*

E)     *Dr Breitfeld acknowledges that the restrictions set out above are reasonable and necessary for the protection of the legitimate interests of Byton and any Relevant Group Company with whom or on whose behalf he has had business dealings and that, having regard to those interests, these restrictions do not work unreasonably on him.*

F)     *The restrictions imposed on Dr Breitfeld by paragraph 14(B) apply to him acting:*

i)     *directly or indirectly; and*

ii)      *on his own behalf or on behalf of, or in conjunction with, any firm, company or person.*

G)      *For the purposes of this paragraph, the following words shall be defined as follows:*

i)      *"Relevant Period" means the twelve (12) month period prior to and including the Termination Date;*

ii)      *"Restricted Business" means the business of Byton or any Relevant Group Company in Hong Kong or in any other jurisdiction in which Byton or any Relevant Group Company does business and in respect of which Dr Breitfeld on behalf of Byton or any Relevant Group Company has performed duties or services, had business dealings or had managerial responsibility within the Relevant Period;*

iii)      *"Group Company" means any subsidiary of Byton, any other company which is for the time being a parent or holding company of Byton and any subsidiary of any such parent or holding company;*

iv)      *"Relevant Group Company" means a Group Company for whom Dr Breitfeld have performed duties or services or in respect of which he has had managerial responsibility or about which he was provided with confidential information within the Relevant Period;*

v)      *"Restricted Period" means the six (6) month period immediately after the Termination Date; and*

vi)      *"Termination Date" means the last day of Dr Breitfeld's employment with Byton, howsoever arising.*

H)      *Each of the restrictions in this paragraph 14 shall survive the termination of this employment letter and is intended to be separate and severable. If any of the restrictions shall be held to be void but would be valid if part of their wording were deleted, such restriction shall apply with such deletion as may be necessary to make it valid or effective."*

7.    <u>Confidential Information</u>

Following Clause 14 of the Employment Agreement, the following new Clause 15 shall be inserted:-

" *15.*    *Confidential Information*

*Dr Breitfeld acknowledges and agrees that he will keep in strict confidence all information about Byton, its business, investors, clients, products, trade secrets, technologies and know-how ("**Confidential Information**"), and will not, at any time during the continuance or after the termination of his employment, divulge any matters or things relating to the Confidential Information to any unauthorized person or utilize any secret or confidential knowledge or information acquired in consequence of his services hereunder to the detriment or prejudice to Byton or its clients. A breach of this clause shall result in summary termination of Dr Breitfeld's employment with immediate effect. Upon the termination of his employment, Dr Breitfeld must forthwith return all documents and other property belonging to Byton and acknowledge that he has not kept copies thereof.*"

8.      Intellectual Property

Following Clause 15 of the Employment Agreement, the following new Clause 16 shall be inserted:-

"*16.*      *Intellectual Property*

*A)*      *Dr Breitfeld shall give Byton full written details of all Inventions and of all works embodying Intellectual Property Rights made wholly or partially by him at any time during the course of his employment which relate to, or are reasonably capable of being used in, the business of Bytom. He acknowledges that all Intellectual Property Rights subsisting (or which may in the future subsist) in all such Inventions and works shall automatically, on creation, vest in Byton absolutely. To the extent that they do not vest automatically, Dr Breitfeld shall be deemed to hold them on trust for Byton. Dr Breitfeld acknowledges and agrees to execute without delay all documents and do all acts as may, in the opinion of Byton, be necessary to give effect to this Clause 16(A).*

*B)*      *Dr Breitfeld hereby irrevocably waives all moral rights under any applicable laws of any jurisdictions which he has or will have in any existing or future works referred to in paragraph 16(A).*

*C)*      *Dr Breitfeld irrevocably appoints Byton to be his attorney in his name and on his behalf to execute documents, use his name and do all things which are necessary or desirable for Byton to obtain for itself or its nominee the full benefit of this Clause 16.*

*D)*      *For the purposes of this Clause 16, the following words shall be defined as follows:*

*i)*      *"Intellectual Property Rights" means patents, rights to Inventions, copyright and related rights, trademarks, trade names and domain names, rights in get-up, goodwill and the right to sue for passing off or unfair competition, rights in designs, rights in computer software, database rights, rights to preserve the confidentiality of information (including know-how and trade secrets) and any other intellectual property rights, in each case whether registered or unregistered and including all applications (or rights to apply) for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which may now or in the future subsist in any part of the world; and*

*ii)*      *"Inventions" means inventions, ideas and improvements, whether or not patentable, and whether or not recorded in any medium."*

9.      Governing Law

Following Clause 16 of the Employment Agreement, the following new Clause 17 shall be inserted:-

"*17.*      *Governing Law*

*This Contract shall be governed by and construed in accordance with the laws of the Hong Kong. The parties agree to submit to the exclusive jurisdiction of the Hong Kong courts and tribunals.*"

10.     Severability

Following Clause 17 of the Employment Agreement, the following new Clause 18 shall be inserted:-

"*18.       Severability*

*If any paragraph of this Contract, or part of any paragraph, is found by a court of competent jurisdiction or other competent authority to be invalid, unlawful or unenforceable, then the paragraph or part will be severed from the remainder of this employment letter, which will continue to be valid and enforceable to the fullest extent permitted by law.*"

11.     Definition

The defined term "FMC" in the Employment Agreement shall be replaced with "Byton", and the term "Dr. –Ing. Carsten Breitfeld" in the Employment Agreement shall be replaced with the "Dr Breitfeld".

Save and except as expressly varied by this letter, all other terms in the Employment Agreement shall remain valid and unaffected.


This letter shall be governed by the laws of Hong Kong, and has been executed and delivered as a deed on the date hereof.


Yours faithfully


**EXECUTED AS A DEED**
for and on behalf of
**Byton Limited**
by:


_____
Dr Daniel Kirchert
Director


Signature by Dr Breitfeld follows

**ACCEPTANCE AND ACKNOWLEDGEMENT**

I, Dr Cartsen Delf Breitfeld, hereby confirm my acceptance of and agreement to the provisions of this letter as set out above.

**Signed, sealed and delivered**
as a **Deed** by

_____

Dr Cartsen Delf Breitfeld
German Passport No. CF9JF53TN
Date:

…………………………………..

*Signature of witness*

*Name:*   Matt Barter

*Address:*   c/o Byton, Unit1312, 13/F, Tower 1, Lippo Centre, 89 Queensway, HK

*Occupation:*   Lawyer

# EXHIBIT C

Cipple Centre, Unit 13&14&7, Tower 1, 69 Queensway, Hong Kong

www.byton.com

Carsten Breitfeld
Tannenstrasse 25c, 85640 Putzbrunn

December 1, 2018

Dear Carsten,

### Secondment to Byton North America Inc.

Further to the recent discussions between you and the Company, we are pleased to confirm your secondment arrangement to Santa Clara, California. We write to confirm the terms of your secondment to Byton North America Inc. (the **"Host"**), as agreed with you.

1.    You shall remain employed by Byton Limited (formerly known as "Future Mobility Corporation Limited")" (the **"Company"**) during the secondment and your current terms of employment shall remain unchanged, except as set out in this letter. At the end of the secondment, the Company currently intends that you will return to your current position on the terms applying before the secondment, or a suitable alternative if that role no longer exists.

2.    The secondment commenced on Jun 23rd, 2017, subject to the approval by the relevant U.S. immigration authorities of your U.S. work permit, and shall continue for a minimum term of 2.85 years, until Apr 30th, 2020. The secondment may be extended for a further term of 1.19 years subject to a strategic market review to be conducted between yourself and the Company prior to Apr 30th, 2020.

3.    During the secondment you shall:

    (a)    continue to abide by the terms of your employment contract with the Company;

    (b)    act as the CEO of both the host location and Hong Kong, and carry out any work that is reasonably required of you;

    (c)    continue to receive your salary in accordance with the terms of your employment contract with the Company, which includes but is not limited to: a base annual salary of EUR 565,250, targeted bonus of EUR 242,250 (net of applicable China, Hong Kong, and/or U.S. individual income taxes), company car and an annual car allowance of net EUR 1,000/month.

    (d)    be entitled to residential accommodation with rental not exceeding HKD 220,000 per month which shall be provided to you by the Host.

    (e)    work at the Host's premises at 4201 Burton Drive, Santa Clara, CA 95054.

www.byton.com

4.  The Company shall continue to pay your salary in the normal way and you shall continue to participate in the existing pension schemes of the Company.

5.  You consent to the Company providing relevant information about you to the Host in connection with the secondment.

Please sign the enclosed copy of this letter and return it to Human Resources Hong Kong of the Company, to indicate your agreement to the terms in this letter.

Yours  sincerely,

For and on behalf of
**Byton Limited**

Daniel Kirchert
President & Co-founder

ACCEPTANCE AND ACKNOWLEDGEMENT

I, Carsten Breitfeld, hereby confirm my acceptance and agreement to the provisions of this letter as set out above.

Name: Carsten Breitfeld

2